Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Hannah Mathieson (SBN 358967)
hannah@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue
San Francisco, CA 94129
Tel: (415) 360-2962

Erina Kwon (SBN 235079)
erina@lawaterkeeper.org
Benjamin Harris (SBN 313193)
ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Saint-Gobain North America; GS II, Inc.; CertainTeed Holding Corporation; and CertainTeed, LLC,<br><br>Defendants. | Case No. 2:25-cv-3942<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

## I.    **JURISDICTION AND VENUE**

1.    This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et seq.*

2.    This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") and Saint-Gobain North America, GS II, Inc., CertainTeed Holding Corporation, and CertainTeed, LLC ("Saint-Gobain" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.    This complaint ("Complaint") seeks relief for ongoing violations by Saint-Gobain of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ*, as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ*, *Order No. 2014-0057-DWQ,* and as amended on November 6, 2018 ("General Permit"), related to polluted storm water and non-storm water discharges from the construction aggregates distribution facility owned and operated by Saint-Gobain at and near 1431 West E Street in Wilmington, California ("Facility").

4.    The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration) and 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties).

5.     Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation or order alleged to be violated, the activity alleged to constitute the violations, the location of alleged violations, and the date or dates of such violations. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.     The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act and, where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.     A copy of the Notice Letter must be mailed to the Attorney General, U.S. Department of Justice ("U.S. DOJ"), the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8.     On February 26, 2025, Plaintiff sent a Notice Letter via certified mail to Saint-Gobain and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the Notice Period. A true and accurate copy of the Notice Letter as provided to

1   Saint-Gobain is attached to, and incorporated by reference into, this Complaint at

2   EXHIBIT 1.

3        9.      The Notice Letter was received by Donald Roberts, CertainTeed

4   Roofing's Plant Manager, on March 3, 2025 (Certified Mail No.

5   9589071052702583823370).

6        10.     The Notice Letter was received by Mark Rayfield, Chief Executive

7   Officer of GS II, Inc. (Certified Mail No. 9589071052702583823332), CertainTeed

8   LLC (Certified Mail No. 9589071052702583823325), and Saint-Gobain North

9   America (Certified Mail No.9589071052702583823349) on March 3, 2025;

10       11.     The Notice Letter was received by Robert Panaro, Chief Executive

11  Officer of CertainTeed Holding Company, on March 3, 2025 (Certified Mail No.

12  9589071052702583823363).

13       12.     The Notice Letter was received by CT Corporation System, Registered

14  Corporate 1505 Agent, Saint-Gobain's registered agent for service of process on

15  March 3, 2025 (Certified Mail No. 9589071052702583823356).

16       13.     The Notice Letter was also received by the U.S. Attorney General on

17  March 4, 2025 (Certified Mail No. 9589071052702583823387); Administrator of the

18  U.S. EPA on March 3, 2025 (Certified Mail No. 9589071052702583823424);

19  Regional Administrator of the U.S. EPA, Region IX on March 3, 2025 (Certified Mail

20  No. 9589071052702583823394); Director of the State Water Resources Control

21  Board on March 3, 2025 (Certified Mail No. 9589071052702583823417); and

22  Executive Officer of the L.A. Regional Water Quality Control Board on March 7,

23  2025 (Certified Mail No. 9589071052702583823400).

14.     More than sixty (60) days have passed since the Notice Letter was served on Saint-Gobain, and the State and Federal agencies.

15.     Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this complaint.

16.     Plaintiff's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

17.     Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

LA Waterkeeper, by and through its counsel, hereby alleges:

## II.    __INTRODUCTION__

18.     This Complaint seeks relief for unpermitted and unlawful discharges of pollutants, polluted storm water, and polluted non-storm water from the Facility to waters of the United States in violation of the Act and General Permit.

19.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Los Angeles' storm drains and contaminate local streams, creeks, rivers, estuaries, harbors, bays, beaches, and coastal waters.

20.     The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See*, *e.g.*, Steven Bay et al., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (1999).

21.     Numerous scientific studies in recent decades have documented serious health risks to recreational users of Southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See*, *e.g.*, Michael K. Stenstrom, *Southern California Environmental Report Card: Stormwater Impact* 15 (1998); Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* 205 (2000).

22.     A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Robert W. Haile et al., Santa Monica Bay Restoration Project, *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* 5 (1996).

23.     Los Angeles' waterways, including within the Port of Long Beach and connected coastal and ocean waters, are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

24.     Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

25.     Los Angeles' waterways also provide non-contact recreation, aesthetic, and spiritual opportunities, such as hiking, running, biking, and wildlife observation.

26.     Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, trash, and other pollutants contribute to the impairment of surface waters and aquatic dependent wildlife, expose

people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

27.    Discharges of polluted storm water and non-storm water to local surface waters pose carcinogenic, developmental, and reproductive toxicity threats to the public (including LA Waterkeeper members), adversely affect the aquatic environment, and impair the tourist economy on which much of the region depends.

28.    These contaminated discharges can and must be controlled as required by the CWA for ecosystems to regain their health and to protect public health.

29.    Controlling polluted storm water and non-storm water discharges associated with industrial activity is vital to protecting southern California's surface and coastal waters, and essential to LA Waterkeeper's mission.

30.    Defendant is liable under the CWA for its past and ongoing failures to comply with the Act, including failures to comply with the General Permit's discharge prohibitions, technology-based and water quality-based effluent limitations, planning and monitoring requirements, remedial action requirements, and other procedural and substantive requirements. *See* 33 U.S.C. §§ 1342, 1365.

31.    Defendant is liable for daily, monthly, and annual violations of the General Permit since at least February 26, 2020. *See* 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

## III.    <u>THE PARTIES</u>

### A.    LA Waterkeeper

32.    LA Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 360 East 2nd

1    Street, Suite 250, Los Angeles, California.

2    33.    Founded in 1993, LA Waterkeeper is dedicated to the preservation,

3    protection and defense of the inland and coastal surface and ground waters of Los

4    Angeles County. LA Waterkeeper's mission is to fight for the health of the region's

5    waterways, and for sustainable, equitable and climate-friendly water supplies.

6    34.    The organization works to achieve this goal through education, outreach,

7    advocacy and, where necessary, litigation and enforcement actions under the Clean

8    Water Act on behalf of itself and its members.

9    35.    LA Waterkeeper members live, work, and recreate in and around the Los

10    Angeles basin, including many who live and/or recreate in and around the greater Los

11    Angeles and Long Beach Harbor waters, specifically an area designated by the State

12    Board as the "Inner Harbor," as well as the beaches, and nearshore and coastal waters

13    of the Pacific Ocean between Santa Monica and Huntington Beach (collectively, the

14    "Receiving Waters").

15    36.    LA Waterkeeper members use and enjoy the Receiving Waters to fish,

16    surf, swim, sail, SCUBA dive, kayak, bird/wildlife watch, bike, run, hike, and walk.

17    LA Waterkeeper members also use the Receiving Waters to engage in education and

18    scientific study through pollution and habitat monitoring and restoration activities.

19    37.    The Facility's unlawful discharge of pollutants into the Receiving

20    Waters, and failure to comply with the General Permit's non-discharge mandates

21    (e.g., storm water quality monitoring), harm LA Waterkeeper's members and impair

22    their ability to use and enjoy these waters. The interests of LA Waterkeeper and its

23    members, therefore, have been, are being, and will continue to be adversely affected

by the Facility's failure to comply with the Act and General Permit.

38.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

39.    The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B.    Owner and/or Operator of the Facility**

40.    The Facility operates publicly as CertainTeed-Saint-Gobain. *See* IMAGE 1.

IMAGE 1
The Facility's Front Office



41.    CertainTeed is listed on the "Our Brands" section of the Saint-Gobain North America website in the "Building Material" category. *See* IMAGE 2.

IMAGE 2
Screenshot of the Saint-Gobain North American Website

1

42.     The most recent Pollution Prevention Plan certified on SMARTS for the

2
Facility identifies individuals with corporate Saint-Gobain emails, i.e., ends with

3
"@saint-gobain.com," as the Plant Manager and Environmental Lead. *See* IMAGE 3.

4
IMAGE 3

Screenshot of the Facility's Most Recent Pollution Prevention Plan

5



6

7

8

9

10

43.     The Notice of Intent for the Facility filed January 31, 2024 with the State

11
Board lists GS II, Inc. as the Facility's owner and operator, and the individual identified

12
as the contact person has a corporate Saint-Gobain email, i.e., ends with "@saint-

13
gobain.com."

14
44.     GS II, Inc. filed an initial Statement and Designation by Foreign

15
Corporation with California's Secretary of State on August 11, 2016. GS II, Inc.

16
subsequently filed Statements of Information with California's Secretary of State in

17
2023 and 2024. Each of the entity's filings list its address as 20 Moores Road in

18
Malvern, Pennsylvania, which is the address for the Saint-Gobain North American

19
headquarters.

20
45.     Each of the named defendants—Saint-Gobain North America, GS II, Inc.,

21
CertainTeed Holding Corporation, and CertainTeed LLC—currently owns, operates, or

22
controls industrial operations at the Facility, and/or has owned, operated, or controlled

23
industrial operations at the Facility for some part of the last 5-years, i.e., during the

statute of limitations period applicable to liability for violations alleged in this Complaint.

46.     The Facility's primary industrial activities include manufacturing roofing shingles.

47.     Storm water discharges from the Facility flow from as many as three (3) discharge points into an area of the greater Los Angeles and Long Beach Harbor Waters designated by the State Board as the "Inner Harbor" (the "Receiving Waters").

48.     According to the State Board's online database for NPDES permit compliance filings—the Storm Water Multiple Application and Report Tracking System ("SMARTS")—the Facility operates under the Waste Discharge Identification Number 4 19I009176 since at least 2010.

49.     Defendant filed a Notice of Intent to enroll the Facility in the General Permit as early as March 1, 2010.

50.     Saint-Gobain has classified industrial activity at the Facility under Standard Industrial Classification ("SIC") code 2952 (Asphalt Felts and Coatings).

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act

51.     The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

52.     To accomplish this goal, section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United

States unless the discharge complies with other enumerated sections of the Act, including prohibition of discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402. *Id*. §§ 1311, 1342(b); *see also* General Permit § I.A.12.

53.     The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

54.     All unpermitted discharges of polluted storm water associated with industrial activities are violations of the Act. 33 U.S.C. § 1311(a).

55.     Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. *Id.* § 1342(p).

56.     Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. *Id*. § 1342(b).

57.     States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. *Id.*

58.     Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *Id*. §§ 1365(a)(1), 1365(f).

59.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; and/or (b) a condition of an NPDES permit such as the General Permit. *Id.* § 1365(f).

60.    A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. *Id.* § 1362(5).

61.    The Act is a strict liability statute. *Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 940 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City & Cnty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993).

62.    Each violation of any term or condition in an NPDES permit is an independent violation of the Act. 33 U.S.C. § 1311(d). Each separate violation of the Act subjects the violator to a penalty of up to $59,973.00 per day per violation for violations occurring after November 2, 2015. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

63.    Section 505(d) of the Act allows a prevailing or substantially prevailing party to recover litigation costs, including fees for attorneys, experts, and consultants where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d); *see also St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1062–64 (9th Cir. 2009) (holding that the court's discretion to deny a fee award to a prevailing plaintiff is narrow, and denial is "extremely rare.").

**B.    California's Storm Water Permit**

64.    The State Board is charged with regulating pollutants to protect California's water resources, Cal. Water Code § 13001, and is designated as the state

1    agency for all purposes stated in the CWA, *id.* § 13160(a).

2        65.    California is authorized by U.S. EPA to issue NPDES permits for storm

3    water discharges associated with industrial activities. U.S. EPA, *NPDES State*

4    *Program Authority*, https://www.epa.gov/npdes/npdes-state-program-authority (last

5    updated on Jan. 3, 2023); *see* 33 U.S.C. § 1342(b); 40 C.F.R. § 122.28(a).

6        66.    The relevant NPDES permit in this action is the General Permit, which is

7    issued by the State Board and implemented and enforced by Regional Board Water

8    Quality Control Boards, including the Los Angeles Regional Water Quality Control

9    Board ("Regional Board").

10        67.    In order to discharge storm water lawfully, certain industrial dischargers

11    in California must obtain coverage under the General Permit and comply with all its

12    terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also* General Permit §

13    I.A.12.

14        68.    Facilities undertaking industrial activities classified under Standard

15    Industrial Classification code 2952 are required to apply for, and obtain coverage

16    under, the General Permit by submitting a Notice of Intent to the State Board. General

17    Permit § I.A.12; General Permit Attachment A, § 2.

18        69.    The Notice of Intent serves as certification to the State of California that

19    the industrial facility owner(s), operator(s), and/or agent(s) have read the General

20    Permit and will comply with all its terms and conditions.

21        70.    Once enrolled, the General Permit requires permittees to engage in

22    executive planning and facility-specific pollution control design, on-the-ground

23    implementation of pollution control technologies, monitoring storm water discharges

for evidence of pollution, and an annual evaluation of the effectiveness of pollution control strategies, including corrective action when necessary.

71.     The General Permit's annual compliance period runs from July 1 of each calendar year to June 30 of the subsequent calendar year ("Reporting Year"), e.g. July 1, 2022 through June 30, 2023.

72.     Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges. 33 U.S.C. § 1311(b)(2)(A), (E).

73.     Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit § XXI.A; *see also* General Permit § I.A.8 ("This General Permit authorizes discharges of industrial storm water […] so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.").

74.     Permittees that fail to comply with the terms and conditions of the General Permit, therefore, are liable for violations of the Act. *Nw. Envtl. Advocates. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce all permit conditions."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural.").

75.     Saint-Gobain must enroll in and comply with the terms and conditions of the General Permit to lawfully discharge storm water associated with industrial activity to the Receiving Waters. General Permit § I.A.8.

76.     Saint-Gobain is liable for past and ongoing violations of the General Permit, and civil penalties and injunctive relief are available remedies. *See* 33 U.S.C. §§ 1311, 1342.

**C.      The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

77.     The General Permit contains the following three sections restricting the discharge of pollutants in storm water from the Facility: (1) Discharge Prohibitions; (2) technology-based effluent limitations; and (3) water quality-based effluent limitations.

1.   Discharge Prohibitions

78.     The General Permit's Discharge Prohibitions include the prohibition of any "discharges of liquids or materials other than storm water" (e.g., vehicle or building wash water, industrial particulates, water used for dust suppression, chemical spills, trash) not otherwise authorized by another NPDES permit, either directly or indirectly to waters of the United States. General Permit § III.B.

79.     The General Permit's Discharge Prohibitions also prohibit storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit § III.C.

80.     The General Permit's Discharge Prohibitions further prohibit discharges that violate any discharge prohibitions contained in any applicable Regional Water Board Water Quality Control Plans, or any statewide water quality control plans and policies. General Permit § III.D.

1

## 2. Technology-Based Effluent Limitations

2      81.    The General Permit contains technology-based effluent limitations that

3 set the floor for pollution reduction, i.e., the minimum level of pollution reduction that

4 must be achieved by all permittees, regardless of the quality of water to which a

5 permittee facility discharges. General Permit § V; *see also* General Permit, Fact Sheet

6 § II.D.31 ("[Clean Water Act] Section 301(b)(1)(A) requires that discharges from

7 existing facilities must, *at a minimum*, comply with technology-based effluent

8 limitations based on the technological capability of Dischargers to control pollutants

9 in their discharges." (emphasis added)).

10      82.    The General Permit's technology-based effluent limitations require

11 permittee facilities to reduce or prevent pollutants in storm water discharges through

12 the implementation of pollution controls that achieve the Best Available Technology

13 Economically Achievable ("BAT") in the industry for toxic or non-conventional

14 pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for

15 conventional pollutants. General Permit § V.A, Fact Sheet § II.D.5; *see* 40 C.F.R. §§

16 401.15–.16 (listing conventional and toxic/non-conventional pollutants).

17      83.    Compliance with the General Permit's technology-based effluent

18 limitations requires permittees to design and implement effective, site-specific

19 pollution control strategies called Best Management Practices ("BMPs") that prevent

20 or reduce storm water discharges consistent with BAT/BCT pollution reduction

21 industry standards. General Permit § V.A; General Permit, Fact Sheet § II.D.5

22 ("Dischargers must implement BMPs that meet or exceed the BAT/BCT technology-

23 based standard.").

84.    Best Management Practices are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. Best Management Practices include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility. 40 C.F.R. § 122.2.

85.    Permittees must design Best Management Practices that meet the BCT standard for all sources of conventional pollutants, including total suspended solids, oil and grease, and pH. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(1)(A); *see* 40 C.F.R. § 401.16 (listing conventional pollutants).

86.    Permittees must thereafter implement and maintain, as well as evaluate and improve, their Best Management Practices to ensure that the concentration of conventional pollutants in any storm water discharge is controlled consistent with the BCT standard. General Permit, Fact Sheet § II.D.5.

87.    Permittees must design Best Management Practices that meet the BAT standard for all sources of toxic pollutants. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(2)(A); *see* 40 C.F.R. § 401.15 (listing toxic pollutants).

88.    Permittees must implement and maintain, as well as evaluate and improve, those Best Management Practices to ensure that the concentration of any toxic pollutant in any storm water discharge is reduced consistent with the BAT standard. General Permit, Fact Sheet § II.D.5.

89.    Multiple pollutants discharged and/or emitted (or potentially discharged/emitted) from the Facility are classified as toxic pollutants pursuant section 307(a)(1) of the Act, including without limitation copper, cadmium,

1  chromium, lead, and zinc. *See* 40 C.F.R. § 401.15.

2      90.    The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water

3  Multi-Sector General Permit for Industrial Activities include numeric standards called

4  benchmark pollutant concentrations for industrial storm water discharges ("U.S. EPA

5  Benchmarks"). U.S. EPA, National Pollutant Discharge Elimination System (NPDES)

6  Multi-Sector General Permit (MSGP) for Storm Water Discharges Associated with

7  Industrial Activity § 4.2.2 (as modified Mar. 1, 2021).

8      91.    U.S. EPA Benchmarks are objective numeric standards for evaluating

9  whether the Best Management Practices designed and implemented at a facility

10 achieve the statutory BAT/BCT standard. *See* 80 Fed. Reg. 34403, 34405 (June 16,

11 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746,

12 64766–64767 (Oct. 30, 2000).

13     92.    Discharges of storm water containing pollutant concentrations exceeding

14 U.S. EPA Benchmarks evidence a failure to develop and implement pollution control

15 strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica*

16 *Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2nd 914, 921–25 (C.D. Cal. 2009);

17 *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

18     93.    Tables 1and 2 contains some of U.S. EPA Benchmarks relevant to the

19 assessing the Facility's compliance with the BAT/BCT standard.

20

**TABLE 1**

U.S. EPA S<small>ALTWATER</small> B<small>ENCHMARKS</small> A<small>PPLICABLE TO THE</small> F<small>ACILITY'S</small> D<small>ISCHARGES</small>

| *POLLUTANT* | *2015 BENCHMARK* | *2021 BENCHMARK* |
|---|---|---|
| total suspended solids | 100 mg/L[1] | 100 mg/L |

23

---

[1] mg/L = milligrams per liter.

| aluminum | 0.75 mg/L | 1.1 mg/L |
| cadmium | 0.04 mg/L | 0.033 mg/L |
| copper | 0.0048 mg/L | 0.0048 mg/L |
| iron | 1.0 mg/L | n/a |
| lead | 0.21 mg/L | 0.21 mg/L |
| nickel | 0.074 mg/L | 0.074 mg/L |
| zinc | 0.09 mg/L | 0.09 mg/L |

**TABLE 2**
U.S. EPA FRESHWATER BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| *POLLUTANT* | *2015 BENCHMARK* | *2021 BENCHMARK* |
|---|---|---|
| total suspended solids | 100 mg/L | 100 mg/L |
| aluminum | 0.75 mg/L | 1.1 mg/L |
| cadmium | 0.0021 mg/L | 0.0018 mg/L |
| copper | 0.014 mg/L | 0.00519 mg/L |
| iron | 1.0 mg/L | n/a |
| lead | 0.082 mg/L | 0.082 mg/L |
| nickel | 0.47 mg/L | 0.47 mg/L |
| zinc | 0.12 mg/L | 0.12 mg/L |

94.    Records of visual observations required to be maintained by the General Permit are relevant to assessing a permittee's compliance with the BAT/BCT standard.

95.    Best practices within an industrial category, and/or implemented at similar industrial facilities, are relevant measures for evaluating whether a permittee's Best Management Practices comply with the BAT/BCT standard.

### 3.  Water Quality-Based Effluent Limitations

96.    In addition to complying with the General Permit's technology-based effluent limitations, permittees are required to meet "any more stringent [water

1  quality-based limitations] necessary for receiving waters to meet applicable water

2  quality standards." General Permit § I.D.31; *see also* 33 U.S.C. § 1311(b)(1)(C).

3      97.    Unlike the General Permit's technology-based effluent limitations,

4  compliance with water quality-based effluent limitations (a.k.a., "Receiving Water

5  Limitations") depends on the status of surface waters receiving a given facility's

6  storm water discharge.

7      98.    Receiving Water Limitations are intended to protect designated

8  beneficial uses of surface waters to which a facility discharges storm water. General

9  Permit § VI.A.

10     99.    Beneficial uses of the Receiving Waters are defined in the *Water Quality*

11 *Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los*

12 *Angeles and Ventura Counties* ("Basin Plan"), promulgated by the California

13 Regional Water Quality Control Board, Los Angeles Region 4 and most recently

14 amended February 13, 2020.

15     100.   Existing and potential designated beneficial uses of the Los

16 Angeles/Long Beach Inner Harbor include: Water Contact Recreation; Non-contact

17 Water Recreation; Industrial Service Supply; Navigation; Commercial and Sport

18 Fishing; Marine Habitat; Rare, Threatened, or Endangered Species; and Shellfish

19 Harvesting. Basin Plan, Table 2-3, 2-3(a).

20     101.   In California law, "water quality objectives" are the numeric or narrative

21 water quality levels established for the "reasonable protection of the beneficial uses

22 and the prevention of nuisance." Cal. Water Code §13050(h).

23     102.   Under federal law, the combination of a designated beneficial use and the

water quality objective (or criterion) set to protect the use results in what is referred to as a "water quality standard." 40 C.F.R. §131.2 and §131.3(i).

103.   Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to instream exceedances of a water quality standard are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act and placed on the "303(d) List." 33 U.S.C. § 1313(d).

104.   According to the State Board's 2020–2022 Integrated 303(d) List of Impaired Water Bodies, the Los Angeles/Long Beach Inner Harbor is impaired for, among other pollutants, copper, toxicity, silver, zinc, and benthic community effects.

105.   Storm water discharges from the Facility to the Inner Harbor containing Total Suspended Solid concentrations exceeding 100 mg/L are violations of the General Permit's water quality-based effluent limitations. General Permit § VI.A.

106.   The General Permit contains three Receiving Water Limitations. General Permit § VI.A–C.

107.   The first Receiving Water Limitation prohibits discharges of storm water associated with industrial activity that causes or contributes to an exceedance of any applicable water quality standards ("WQSs"). General Permit § VI.A; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–1167 (9th Cir. 1999) (holding that industrial storm water discharges must strictly comply with water quality standards).

108.   Water quality standards applicable to the Receiving Waters include without limitation:

(1) the numeric aquatic life and human health criteria set out in the

California Toxics Rule ("CTR"), 40 C.F.R. 131.38, *see also* 65 Fed. Reg. 31712 (May 18, 2000), which apply to the Receiving Waters except for impairments/pollutants being addressed by a TMDL or similar instrument (e.g., Site Specific Objectives) (See Tables 1 and 2);

(2) all numeric objectives contained in the Basin Plan or subsequent amendments;

(3) all narrative objectives contained in the Basin Plan or subsequent amendments (e.g., "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan at 3-38).

109.   Storm water discharges with pollutant concentrations that cause or contribute to an exceedance of any applicable water quality standards are violations of the General Permit and the Act.

110.   The Basin Plan and California Toxics Rule set applicable water quality standards for storm water discharges from the Facility containing pollutants not addressed by the Dominguez/Harbor Waters TMDL, including without limitation cadmium, copper, hexavalent chromium, nickel, and mercury.

111.   The California Toxics Rule sets numeric criteria for 23 priority toxic pollutants to protect aquatic life and for 57 priority toxic pollutants to protect human health based on the U.S. EPA Administrator's determination that such numeric criteria are necessary in the State of California to protect human health and the environment. 65 FR 31681 (May 18, 2000); *see also* 40 C.F.R. § 131.2 ("Such standards [] serve as the regulatory basis for the establishment of water-quality-based

treatment controls and strategies beyond the technology-based levels of treatment required by sections 301(b) and 306 of the Act.")

**TABLE 3**
CTR "END OF PIPE" CRITERIA APPLICABLE TO FACILITY DISCHARGES

| POLLUTANT | CTR LIMIT |
|-----------|-----------|
| copper | 0.0048 mg/L |
| lead | 0.21 mg/L |
| zinc | 0.09 mg/L |
| cadmium | 0.042 mg/L |
| chromium | 1.1 mg/L |
| nickel | 0.074 mg/L |

112.    The General Permit's second water quality-based effluent limitation is that pollutant concentrations in storm water discharges shall "not adversely impact human health or the environment." General Permit § VI.B.

113.    Storm water discharges with pollutant concentrations that adversely impact human health or the environment are violations of the General Permit and the Act.

114.    The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit § VI.C.

115.    Storm water discharges with pollutant concentrations that threaten to cause pollution or a public nuisance are violations of the General Permit and the Act.

116.    Polluted storm water and non-storm water discharges from the Facility harm use and enjoyment of the Receiving Waters for recreational, aesthetic, spiritual, and other activities by LA Waterkeeper members and the public.

117.   Permittees are required to complete Water Quality Based Corrective Actions when industrial storm water discharges contain pollutant concentrations that violate Receiving Water Limitations. General Permit § XX.B.

118.   Water Quality Based Corrective Actions include without limitation:

(1) an evaluation of pollutant sources and Best Management Practices implementation;

(2) assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

(3) certification that all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's Pollution Prevention Plan. *See* General Permit § XX.B.1.a–c.

119.   Failure to comply with Water Quality Based Corrective Action requirements is an independent violation of this General Permit. General Permit, Fact Sheet II.E.1.

120.   Compliance with the General Permit's Water Quality Based Corrective Actions is an independent mandate, and does not excuse or otherwise impact a permittee's liability for the underlying violations of the Receiving Water Limitations.

4.  Total Maximum Daily Load

121.   Once placed on the 303(d) List, the CWA requires the U.S. EPA or the state to prepare a total daily maximum load ("TMDL") designed to restore the water quality in a water body (or segment) to support designated beneficial uses. 33 U.S.C. § 1313.

122.   The General Permit must contain "effluent limits [that] are consistent

with the assumptions and requirements of any available wasteload allocation for the discharge." 40 C.F.R. § 122.44(d)(1)(vii)(B).

123.   A TMDL specifies the maximum amount of a pollutant that a waterbody (or segment) can receive and still meet water quality standards; and then allocates pollutant loadings to point and non-point sources, as waste load allocations ("WLAs") and load allocations ("LAs"), respectively.

124.   The Los Angeles Regional Water Quality Control Board ("LA Regional Board") approved an Amendment to the Water Quality Control Plan – Los Angeles Region ("Basin Plan") to incorporate the Total Maximum Daily Load for Toxic Pollutants in Dominguez Channel and Greater Los Angeles and Long Beach Harbor Waters ("Dominguez/Harbor Waters TMDL").

125.   "The goal of the Dominguez/Harbor Waters TMDL is to protect and restore fish tissue, water and sediment quality [] by remediating contaminated sediment and controlling the sediment loading and accumulation of contaminated sediment in the Harbors." Attachment A to Resolution No. R11-008 (May 5, 2011) at 2.

126.   The Dominguez/Harbor Waters TMDL assigns WLAs to "Responsible Parties," which include "Individual and General Stormwater Permit Enrollees," e.g., the General Permit.

127.   The Facility is an enrollee in the General Permit, and therefore a Responsible Party for purposes of the Dominguez/Harbor Waters TMDL.

128.   In 2018, the State Board re-opened the General Permit "to amend Attachment E [and] the Fact Sheet [to incorporate enforceable] TMDL-specific []

requirements," including interim and final allocations set in the Dominguez/Harbor Waters TMDL for copper, lead, and zinc. General Permit § I.F.42; *see also* General Permit Fact Sheet § II.F.6.h.iv.

129.   Attachment E to the General Permit includes interim requirements applicable to storm water discharges from the Facility. *See* General Permit Fact Sheet § II.F.6.h.iv ("The [Dominguez/Harbor Waters TMDL] assigns an interim concentration-based WLA for copper, lead, and zinc…to be met at the facility's industrial discharge location(s)[,] and apply at this time.")

130.   To implement the interim requirements of the Dominguez/Harbor Waters TMDL, the General Permit "associates receiving water bed toxicity targets to discharges of…metals bound to sediment particulates. Therefore, [] interim allocation for discharges to [the Inner Harbor] is addressed by complying with th[e] General Permit's [Total Suspended Solid Numeric Action Level] requirements [] to prevent sediment-bound particulates from settling into the receiving water bed." General Permit Fact Sheet § II.F.6.h.iv.

131.   The General Permit's Numeric Action Level for Total Suspended Solids, which is based on and identical to the U.S. EPA Benchmark for Total Suspended Solids, is 100 mg/L.

132.   Storm water discharges from the Facility to the Inner Harbor containing Total Suspended Solid concentrations exceeding 100 mg/L are violations of the General Permit's WLA assigned to industrial storm water discharges established in the Dominguez/Harbor Waters TMDL. General Permit § VII.A.

1   **C.      Storm Water Pollution Prevention Plan Requirements**

2        133.    The General Permit requires permittee facilities to develop and

3   implement a Storm Water Pollution Prevention Plan ("Pollution Prevention Plan")

4   prior to conducting, and in order to lawfully continue, industrial activities. General

5   Permit §§ I.I.54, X.B.

6        134.    "Failure to develop or implement an adequate [Pollution Prevention

7   Plan], or update or revise an existing [Pollution Prevention Plan] as required, is a

8   violation of this General Permit." General Permit, Fact Sheet § II.I.1.

9        135.    The objectives of Pollution Prevention Plans are: (1) to identify and

10  evaluate sources of pollutants associated with industrial activities that may affect the

11  quality of storm water and non-storm water discharges; and (2) to describe and detail

12  site-specific Best Management Practices to reduce or prevent pollutant concentrations

13  in storm water discharges to levels that comply with the General Permit's technology-

14  based and water quality-based effluent limitations. General Permit § X.C.

15       136.    Each Pollution Prevention Plan must include the following elements,

16  among others:

17            (1) a narrative description and assessment of all industrial activities,

18  potential sources of pollution, and pollutants associated with each potential source;

19            (2) identification and location where materials are being shipped,

20  received, stored, and handled, as well as the typical quantities of such materials and

21  the frequency with which they are handled;

22            (3) a description of dust and particulate generating activities;

23            (4) a site map including all areas of industrial activity subject to the

General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, pollutant control measures, and municipal storm drain inlets that may receive the facility's discharge;

(5) a detailed description of the Best Management Practices developed and implemented, as well as a justification for Best Management Practices that are not being implemented;

(6) identification of areas of the Facility where the minimum Best Management Practices do not adequately reduce or prevent pollutants in storm water discharges and advanced Best Management Practices to be implemented in those areas;

(7) identification of unauthorized non-stormwater discharges; and

(8) identification of persons and their current responsibilities for developing and implementing the Pollution Prevention Plan.

137. Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each Pollution Prevention Plan for their potential contribution of pollutants in storm water discharges. General Permit §§ X.C, X.F, X.G.

138. Pollution Prevention Plans must be evaluated and revised as necessary, and on at least an annual basis, to ensure ongoing compliance. General Permit § X.B.

139. Saint-Gobain's failure to develop, implement, or revise a comprehensive Pollution Prevention Plan that contains all required elements is a violation of the General Permit, and establishes liability under the Act. General Permit § X.B; *see also*

1    General Permit, Factsheet § II.I.1.

2        **D.**    **The General Permit's Monitoring and Reporting Requirements**

3        140.   All NPDES permits shall contain water quality monitoring requirements

4    sufficient to assure compliance with permit technology- and water quality-based

5    effluent limitations. *See* 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach

6    NPDES permit shall include . . . monitoring requirements . . . to assure compliance

7    with permit limitations.").

8        141.   Permittees must develop a written plan containing the permittee facility's

9    monitoring and reporting program ("Monitoring Implementation Plan") to be included

10   in the Pollution Prevention Plan prior to conducting, and in order to lawfully continue,

11   industrial activities. General Permit §§ X.I, XI.

12       142.   The objective of the Monitoring Implementation Plan is to detect and

13   measure concentrations of pollutants in a facility's storm water discharges to assess

14   compliance with the General Permit's substantive requirements, including the

15   technology-based BAT/BCT standards, and water quality-based effluent limitations.

16   General Permit, Factsheet § II.J.1.

17       143.   Information derived from the Monitoring Implementation Plan informs

18   each permittee as to whether it must adapt Best Management Practice design and/or

19   implementation to ensure that storm water and non-storm water discharges comply

20   with the General Permit. General Permit §§ X.I, XI.

21       144.   The Monitoring Implementation Plan is an essential component in the

22   General Permit's mandatory iterative self-evaluation process whereby permittees must

23   implement Best Management Practices contained in the Pollution Prevention Plan,

1  evaluate Best Management Practice effectiveness using visual observation and storm

2  water sampling data, and then revise Best Management Practices as necessary to

3  consistently comply with the General Permit's technology-based and water quality-

4  based effluent limitations. *See* 33 U.S.C. § 1342(a)(2).

5      145.   Permittees that fail to develop and implement an adequate Monitoring

6  Implementation Plan that includes both visual observations and sampling and analysis

7  are in violation of the General Permit. General Permit § II.J.3.

8      146.   The CWA requires the collection and analysis of storm water discharge

9  samples sufficient to determine compliance with all permit limits. General Permit §

10  XI.B; *NRDC v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013) ("[T]he Clean

11  Water Act *requires* every NPDES permittee to monitor its discharges into the

12  navigable waters of the United States in a manner sufficient to determine whether it is

13  in compliance with the relevant NPDES permit." (emphasis in original)).

14      147.   The General Permit requires permittees to collect storm water samples

15  from each location where storm water is discharged from its facility. General Permit §

16  XI.B.4–5.

17      148.   The General Permit requires permittees to collect and analyze storm

18  water samples from two Qualifying Storm Events ("QSEs") between July 1 and

19  December 31 of each reporting year and two (2) Qualifying Storm Events between

20  January 1 and June 30 of each reporting year. General Permit § XI.B.2.

21      149.   A Qualifying Storm Event is a precipitation event that: (a) produces a

22  discharge from at least one drainage area at the permittee facility; and (b) is preceded

23  by forty-eight (48) hours with no discharge from any drainage area. General Permit

1   § XI.B.1.

2   150.   Each sample must be collected within four (4) hours of the start of a

3   discharge, or the start of facility operations if the Qualifying Storm Event occurs

4   within the 12-hour period prior to business hours. General Permit § XI.B.5.

5   151.   The General Permit requires permittees to analyze samples for, among

6   other parameters:

7   (1) conventional pollutants (pH, total suspended solids, and either total

8   organic carbon or oil and grease) (§ XI.B.6.a–b);

9   (2) facility-specific pollutants identified in the pollutant source

10   description and evaluation process e.g., copper (§ XI.B.6.c);

11   (3) Standard Industrial Classification code-based parameters listed in the

12   General Permit at Table 1, (§ XI.B.6.d);

13   (4) parameters related to receiving waters with 303(d) listed impairments,

14   or approved Total Maximum Daily Loads, e.g., PAHs (§ XI.B.6.e); and

15   (5) Regional Board-mandated parameters, which are any additional

16   pollutants identified by the relevant Regional Board (§ XI.B.6.f).

17   152.   The General Permit requires permittees to submit all sampling and

18   analytical results for every sample via the State Board's online reporting system

19   within thirty (30) days of obtaining each analytical report from a certified laboratory.

20   General Permit § XI.B.11.a.

21   153.   Permittees must also conduct visual observations at least once a month,

22   and at the same time sampling occurs at each discharge location. General Permit §

23   XI.A.

154.   Records of visual observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit § XI.A.2.

155.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit § XI.A.3.

**E.   Numeric Action Levels and Exceedance Response Actions**

156.   The General Permit requires permittees to take corrective action in response to monitoring data that demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs"). General Permit § XII.

157.   Annual Numeric Action Levels are similar to, and derive from, U.S. EPA Benchmarks. General Permit, Fact Sheet, § I.D. Some of the annual Numeric Action Levels applicable to the Facility are summarized in Table 4.

**TABLE 4**
NUMERIC ACTION LEVELS APPLICABLE TO THE FACILITY'S DISCHARGES

| POLLUTANT | ANNUAL NAL |
|---|---|
| oil & grease | 15 mg/L |
| total suspended solids | 100 mg/L |
| aluminum | 0.75 mg/L |
| iron | 1.0 mg/L |
| copper | 0.0332 mg/L |
| lead | 0.262 mg/L |
| zinc | 0.26 mg/L |

158.   A Numeric Action Levels exceedance occurs when the average of all

sampling data for a given pollutant from a reporting year exceeds the Numeric Action Level assigned to that pollutant, i.e. if the average concentration from three samples of zinc is 0.52 mg/L (e.g., 0.26 mg/L, 0.52 mg/L, and 0.78 mg/L). General Permit § XII.A.1.

159.   Numeric Action Level exceedances operate as a signal to owners/operators, state agencies, and the public that a permittee's Best Management Practices are patently deficient, and therefore immediate remedial actions are required. General Permit § XII.A.

160.   However, the Numeric Action Levels "are not intended to serve as technology-based or water quality-based numeric effluent limitations. The [Numeric Action Levels] are not derived directly from either BAT/BCT requirements or receiving water objectives. [Numeric Action Levels] exceedances defined in this General Permit are not, in and of themselves, violations of this General Permit." General Permit § I.N.77.

161.   The General Permit requires a permittee with Numeric Action Level exceedance(s) to develop and implement Exceedance Response Action ("ERA") procedures. General Permit § XII.

162.   The first time a permittee's storm water sampling data demonstrates an exceedance of a Numeric Action Level, its compliance status changes from Baseline to Level 1 on July 1 following the reporting year during which the exceedance(s) occurred. General Permit § XII.C.

163.   At Level 1 status, a permittee must: evaluate and revise, as necessary, its Best Management Practices with the assistance of a Qualified Industrial Stormwater

Practitioner ("QISP") by October 1; and submit an Exceedance Action Report prepared by the Qualified Industrial Stormwater Practitioner by January 1. General Permit § XII.C.

164. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 Exceedance Response Action report has been completed, all identified additional Best Management Practices have been implemented, and results from four (4) consecutive subsequent qualified storm events sampled indicate no additional NAL exceedances for that parameter. General Permit § XII.C.2.b.

165. A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a Numeric Action Level exceedance for that same parameter while the Discharger is in Level 1. Level 2 status will commence on July 1 following the reporting year during which the additional Numeric Action Level exceedance(s) occurred. General Permit § XII.D.

166. Dischargers with Level 2 status must certify and submit a Level 2 Exceedance Response Action Plan prepared by a Qualified Industrial Stormwater Practitioner that addresses each new Level 2 Numeric Action Level exceedance by January 1 following the year Level 2 status is assigned. General Permit § XII.D.1.a.

167. All elements of the Level 2 Exceedance Response Action Plan must be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 Exceedance Response Action Plan. General Permit § XII.D.1.d.

168. On January 1 of the year following the submittal of the Level 2 Exceedance Response Action Plan, the discharger with Level 2 status must certify and

1    submit a Level 2 Exceedance Response Action Technical Report prepared by a

2    Qualified Industrial Stormwater Practitioner. General Permit § XII.D.2.

3        169.   A discharger's failure to comply with mandatory corrective action

4    process triggered by entering Level 1 or Level 2 status is a violation of the General

5    Permit and the Act. General Permit § I.N.76, Fact Sheet § K.2.b ("[I]t is a violation of

6    the permit [] to fail to comply with the Level 1 status and Level 2 status ERA

7    requirements in the event of [] exceedances.")

8        170.   However, compliance with the Exceedance Response Action

9    requirements does not shield a permittee from liability for violations of the General

10    Permit's technology-based or water quality-based mandates, and does not excuse past

11    or ongoing violations of the General Permit's pollution prevention mandates.

12        **F. The General Plan's Annual Comprehensive Facility Compliance**
         **Evaluation Requirement**

13

14        171.   Permittees must complete an Annual Comprehensive Facility

15    Compliance Evaluation ("Annual Compliance Evaluation") each reporting year.

16    General Permit § XV. The goal of the Annual Compliance Evaluation is to ensure and

17    certify compliance with each of the General Permit's other mandates.

18        172.   The Annual Compliance Evaluation must include, at a minimum:

19        (1) a review of all sampling, visual observation, and inspection records

20    conducted during the previous year;

21        (2) an inspection of all areas of industrial activity and associated

22    pollutant sources for evidence of pollutants entering the storm water conveyance

23    system;

        (3) an inspection of all drainage areas previously identified as having no

COMPLAINT                                              36

exposure to industrial activities;

(4) an inspection of equipment needed to implement Best Management Practices;

(5) an inspection and evaluation of all Best Management Practices for proper design, implementation, and adequate reduction/prevention of pollutants in storm water discharges;

(6) a determination of whether additional Best Management Practices are needed to comply with the General Permit; and

(7) an assessment of any other factors needed to comply with the requirements of Section XVI.B (Annual Report mandates). General Permit § XVI.

173.   The General Permit requires permittees to submit a Compliance Checklist with each Annual Report that contains the following:

(1) an indication of whether the permittee complies with, and has addressed all applicable requirements of, the General Permit;

(2) an explanation for any noncompliance with requirements within the Reporting Year, as indicated in the Compliance Checklist;

(3) an identification, including page numbers and/or sections, of all revisions made to the Pollution Prevention Plan within the Reporting Year; and

(4) the date(s) of the annual Compliance Evaluation.

174.   Any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than

1  $10,000.00 or by imprisonment for not more than two years or by both. General

2  Permit § XXI.N.

3  **V.    STATEMENT OF FACTS**

4      **A. The Facility**

5      175.    Each of the named defendant are "persons" pursuant to the Act. *See* 33

6  U.S.C. § 1362(5).

7      176.    Saint-Gobain is the legally responsible operator of the Facility.

8      177.    Saint-Gobain lists the Facility address as 1431 West E Street in

9  Wilmington, California in all permit registration documents it has submitted to the

10  State Board and Regional Board.

11      178.    Saint-Gobain's permit registration documents state that the Facility

12  operates from 24 hours a day, 6 days a week on average, for 51 weeks per year.

13      179.    The Facility is approximately 9.4 acres.

14      180.    The Facility is 98% impervious.

15      181.    The Facility's primary industrial activities include manufacturing asphalt

16  roofing shingles.

17      182.    According to the Facility's most recent SWPPP, primary raw materials

18  used at the Facility include coating grade asphalt, modified laminate asphalt, modified

19  sealant asphalt, fiber glass mat, backing (sand), surfacing granules, filler (ground

20  limestone), release tape, latex nail paint, plastic wrappers, and wood pallets.

21      183.    The Facility's primary industrial processes occur indoors at the

22  manufacturing building and five (5) warehouses.

23      184.    Saint-Gobain conducts numerous industrial activities in outdoor areas at

the Facility, including without limitation: a) shipping and receiving of industrial materials; b) material handling, movement/transfer and processing; c) industrial material storage; and d) industrial equipment operation.

185.   According to Saint-Gobain, prime and headlap granules are received by 55,000 pound-capacity trucks, 110,000 pound-capacity railcars, and supersack bags with capacities ranging from 2,500 to 4,500 pounds. These granules are unloaded into an underground hopper and then moved via conveyor belt into a building for dry storage.

186.   The sand is received by 55,000 pound-capacity trucks and pneumatically unloaded into a silo, with some granules stored in supersack bags in warehouses.

187.   Filler is also delivered by truck and unloaded into a 400-ton silo. When needed, it is then pneumatically transferred from the silo to an indoor filler use bin.

188.   Coating asphalt is received by 17-ton trucks and unloaded via pumping into a 30,000 gallon capacity storage tank.

189.   Laminate and sealant asphalt are delivered in 23-ton trucks and pumped into two 13,000 gallon capacity storage tanks.

190.   Latex marking paint is received in 27 gallon totes and stored in the Latex Marking Paint Use Area. Unused oils, greases, and lubricants are stored in drums and other containers in the Oil Collection Area and used oil and liquid lubricants are stored on spill pads.

191.   According to Saint-Gobain, the Facility "is generally level with concrete and asphalt surfaces. Storm water runoff from the Site is primarily sheet flow and the flow is directed toward a series of drains throughout the Site."

192.   Water from Drainage Areas 2 and 3, where a significant amount of the Facility's industrial activity is conducted, flows into a storm water "containment area" of an unspecified capacity.

193.   Storm water retained in the containment area is released from four (4) "Release Points" after inspection for oil and pH.

194.   Storm water in other areas of the Facility flow to curbed or bermed areas before evaporating or discharging.

195.   Storm water flows containing pollutants originating from areas at the Facility where Saint-Gobain conducts industrial activities are discharged from at least one discharge point to the "Receiving Waters."

196.   Each of the three publicly available NOIs—certified in 2010, 2015, and 2024—identify the Pacific Ocean as the Facility's Receiving Waters.

197.   The greater Los Angeles and Long Beach Harbor Waters, including the "Inner Harbor," are waters of the United States.

198.   The Pacific Ocean is a water of the United States.

199.   On information and belief, storm water discharged from the Facility flows into the Inner Harbor.

200.   On information and belief, the Inner Harbor is hydrologically connected to the coastal waters in the Santa Monica Bay and the Pacific Ocean.

201.   On information and belief, collectively, the Inner Harbor, nearshore coastal waters, including the Santa Monic Bay and the Pacific Ocean are the Facility's Receiving Waters.

202.   The Regional Water Board issued Saint-Gobain a Notice of Violation for

1    the Facility's deficient 2017 SWPPP on July 30, 2020.

2        203.    The Regional Water Board's findings included the SWPPP's failure to

3    include the handling frequencies of listed industrial material, a complete Monitoring

4    Implementation Plan, and language regarding TMDL requirements applicable to the

5    Facility.

6        204.    Each industrial process undertaken by Saint-Gobain at the Facility,

7    including without limitation those industrial activities described in paragraphs 181

8    through 190 have the potential to generate pollutants that will contaminate its storm

9    water discharges, which flow directly and indirectly into the Receiving Waters.

10        205.    The Facility's sampling data establishes that storm water discharges into

11    the Receiving Waters contain total suspended solids and zinc. See EXHIBIT 1 (at

12    Appendix 1 to the Notice Letter, "*Summary of CertainTeed's Self-Reported Storm*

13    *Water Sampling Data*").

14        206.    Polluted storm water discharges from Standard Industrial Classification

15    2952 (Asphalt Felts and Coatings), such as those conducted at the Facility, can also

16    contain, among other pollutants, materials affecting pH, biochemical oxygen demand,

17    chemical oxygen demand, benzene, methylene blue active substances, metals, and oil

18    and grease. *See* U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector D: Asphalt*

19    *Paving and Roofing Materials, Manufacturers and Lubricant Manufacturers* 2–3 (Feb.

20    2021).

21        207.    Aluminum, iron, copper, lead, petroleum oils/fuels, and compounds

22    affecting pH levels are pollutants associated with industrial activities conducted at the

23    Facility.

COMPLAINT                                          41

208.   On information and belief, storm water containing polycyclic aromatic hydrocarbons (PAHs), hexavalent chromium, toxic metals (e.g. copper, cadmium, nickel, lead, and zinc), oil and grease, total suspended solids, and other pollutants are discharged from the Facility into the Receiving Waters.

209.   Some of these pollutants are on the list of chemicals published by the State of California that are known to cause cancer, birth defects, and/or developmental or reproductive harm. Cal. Health & Safety Code §§ 25249.5-25249.14.

**B. Stormwater Pollution Prevention Plans**

210.   Publicly available Pollution Prevention Plans from 2015, 2016, 2017, 2018, 2019, 2020, 2021, and 2022 demonstrate that Saint-Gobain has failed, and continues to fail, to develop, implement, and/or revise a legally adequate Pollution Prevention Plan.

211.   Patently deficient areas of each of Saint-Gobain's Pollution Prevention Plans include, without limitation:

(1) Failure to describe and address all industrial processes and pollutant sources (e.g., granule and asphalt unloading, and maintenance) (*see* General Permit § X.G.1.a);

(2) Failure to contain BMP descriptions and justifications (§ X.H.4.a-b)

(3) Inadequate Monitoring Plan due to the planning document's failure to prompt Saint-Gobain to collect storm water samples as required by the General Permit or analyze those storm water samples for all parameters potentially present in storm water discharges, including but not limited to copper and lead. (§ XI.B.6)

212.   Every day the Facility operates with an inadequately developed,

implemented, and/or properly revised Pollution Prevention Plans is a separate and distinct violation of the General Permit and Act.

213. These violations are ongoing, and LA Waterkeeper will include additional violations as information becomes available.

**C. Monitoring Implementation Plans**

214. Saint-Gobain has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a Monitoring Implementation Plan that complies with the General Permit's requirements.

215. On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2017-2018 Reporting Year as required by the General Permit. *See* General Permit § XI.B.4.

216. On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018-2019 permit term as required by the General Permit. *See* General Permit § XI.B.4.

217. On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019-2020 permit term as required by the General Permit. *See* General Permit § XI.B.4.

218. On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020-2021 permit term as required by the

General Permit. *See* General Permit § XI.B.4.

219.   On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021-2022 permit term as required by the General Permit. *See* General Permit § XI.B.4.

220.   On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022-2023 permit term as required by the General Permit. *See* General Permit § XI.B.4.

221.   On information and belief, Saint-Gobain personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2023-2024 permit term as required by the General Permit. *See* General Permit § XI.B.4.

222.   Failures to conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges evidence inadequate Monitoring Implementation Plan development and implementation.

223.   On information and belief, Saint-Gobain personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2017-2018 permit term as required by the General Permit. *See* General Permit § XI.B.4.

224.   On information and belief, Saint-Gobain personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018-2019 permit term as required by the

General Permit. *See* General Permit § XI.B.4.

225. On information and belief, Saint-Gobain personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019-2020 permit term as required by the General Permit. *See* General Permit § XI.B.4.

226. On information and belief, Saint-Gobain personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020-2021 permit term as required by the General Permit. *See* General Permit § XI.B.4.

227. On information and belief, Saint-Gobain personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021-2022 permit term as required by the General Permit. *See* General Permit § XI.B.4.

228. On information and belief, Saint-Gobain personnel has not recorded visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022-2023 permit term as required by the General Permit. *See* General Permit § XI.B.4.

229. On information and belief, Saint-Gobain personnel has not recorded visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2023-2024 permit term as required by the General Permit. *See* General Permit § XI.B.4.

230. Saint-Gobain's failure to record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water

1   discharges further evidences inadequate Monitoring Implementation Plan

2   development and implementation.

3       231.   Public weather data establish that the Facility has collected and analyzed

4   storm water samples from storm event that do not meet the definition of a Qualifying

5   Storm Event, including without limitation on March 12, 2020, October 25, 2021,

6   January 30, 2023. *See* EXHIBIT 1 (at Appendix 2 to the Notice Letter, *"List of*

7   *Qualifying Storm Events from January 2020–February 2025"*).

8       232.   Public weather data establish that the Facility failed to collect sufficient

9   storm water samples during Qualifying Storm Events taking place on dates and at

10  times when the Facility was open. *See* EXHIBIT 1 (at Appendix 2 to the Notice

11  Letter, *"List of Qualifying Storm Events from January 2020–February 2025"*).

12      233.   Saint-Gobain's failure to collect sufficient samples from Qualifying

13  Storm Events further evidences inadequate Monitoring Implementation Plan

14  development and implementation.

15      234.   On information and belief, Saint-Gobain has failed to collect storm water

16  samples from all storm water discharge points, including, but not limited to, the

17  locations in Drainage Areas 2 and 3 where storm water flows into the "containment

18  curb", or anywhere necessary to assess efforts to mitigate the trackout of industrial

19  material(s).

20      235.   Saint-Gobain's failures to collect storm water samples from all storm

21  water discharge points further evidence inadequate Monitoring Implementation Plan

22  development and implementation.

23      236.   On information and belief, Saint-Gobain has failed to analyze samples

for all pollutants required by the General Permit, including without limitation pollutants commonly associated with industrial activities conducted at the Facility (e.g., copper, lead, PAHs), and pollutants emitted during industrial activities from the Facility. General Permit § XI.B.6.

237.    Saint-Gobain's failures to analyze storm water samples for all required pollutants further evidence inadequate Monitoring Implementation Plan development and implementation.

**D. Stormwater Sample Collection and Analysis**

238.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on December 4, 2019 contained total suspended solids concentrations of 180 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

239.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 3 on March 12, 2020 contained total suspended solids concentrations of 100 mg/L, which meets the 100 mg/L U.S. EPA Benchmark for total suspended solids.

240.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 1 on January 28, 2021 contained zinc concentrations of 0.10 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

241.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on January 28, 2021 contained zinc concentrations of 0.36 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

242.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on January 28, 2021 contained total suspended solids concentrations of 110 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

243.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on January 28, 2021 contained zinc concentrations of 0.29 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

244.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on January 28, 2021 contained total suspended solids concentrations of 160 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids .

245.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 3 on January 28, 2021 contained zinc concentrations of 0.26 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

246.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 3 on January 28, 2021 contained zinc concentrations of 0.45 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

247.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 3 on January 28, 2021 contained total suspended solids concentrations of 260 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids .

248.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on March 3, 2021 contained zinc concentrations of 2.2 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

249.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 2 on March 3, 2021 contained total suspended solids concentrations of 120 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids .

250.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 3 on March 3, 2021 contained zinc concentrations of 0.47 mg/L, which

1   exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

2   251.   The storm water sample collected by Saint-Gobain at the Facility's

3   Outfall 3 on March 3, 2021 contained total suspended solids concentrations of 210

4   mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids .

5   252.   The storm water sample collected by Saint-Gobain at the Facility's Roof

6   Downspout #1 on March 3, 2021 contained zinc concentrations of 1.3 mg/L, which

7   exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

8   253.   The storm water sample collected by Saint-Gobain at the Facility's Roof

9   Downspout #2 on March 3, 2021 contained zinc concentrations of 1.6 mg/L, which

10  exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

11  254.   The storm water sample collected by Saint-Gobain at the Facility's

12  Outfall 1 on December 14, 2021 contained zinc concentrations of 0.27 mg/L, which

13  exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

14  255.   The storm water sample collected by Saint-Gobain at the Facility's

15  Outfall 1 on December 14, 2021 contained total suspended solids concentrations of

16  120 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended

17  solids .

18  256.   The storm water sample collected by Saint-Gobain at the Facility's

19  Outfall 1 on October 12, 2022 contained zinc concentrations of 0.47 mg/L, which

20  exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

21  257.   The storm water sample collected by Saint-Gobain at the Facility's Roof

22  Downspout #1 on October 12, 2022 contained zinc concentrations of 0.35 mg/L,

23  which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

258.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 1 on January 30, 2023 contained zinc concentrations of 0.15 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

259.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 1 on March 10, 2023 contained zinc concentrations of 0.21 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

260.    The storm water sample collected by Saint-Gobain at the Facility's Outfall 1 on August 20, 2023 contained zinc concentrations of 0.51 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

261.    A true and accurate summary of the data (as reported by Saint-Gobain to the State Board via the SMARTS database) that is the basis for allegations contained in paragraphs 238 through 260 is contained in EXHIBIT 1 (at Appendix 1 to the Notice Letter, "*Summary of CertainTeed's Self-Reported Storm Water Sampling Data*") attached to, and incorporated by reference into, this Complaint.

262.    Every single storm water sample that analyzed zinc since December 2019 contains zinc concentrations that exceed the U.S. EPA Benchmarks for that pollutant.

263.    Exceedances of U.S. EPA Benchmarks evidence failures to develop, implement, and/or maintain Best Management Practices for the Facility that achieve BAT/BCT-level pollutant concentrations.

264.    The Facility is currently at Level 1 status for total suspended solids.

265.    The Facility is currently at Level 2 status for zinc.

266.    Monitoring data summarized in EXHIBIT 1 (at Appendix 1 to the Notice Letter, "*Summary of CertainTeed's Self-Reported Storm Water Sampling Data*") also

establishes consistent exceedances of the numeric criteria for zinc established in the California Toxics Rule for the protection of aquatic life and human health.

267.   Storm water discharges containing pollutant concentrations that exceed California Toxics Rule violate the narrative objective contained in or amended into the Basin Plan that prohibits discharges that produce detrimental physiological responses in human, plant, animal, or aquatic life.

268.   Storm water discharges containing pollutant concentrations that exceed California Toxics Rule numeric criteria adversely impact human health and the environment.

269.   Saint-Gobain has not submitted any reports as required by the General Permit's Water Quality Based Corrective Action requirements despite evidence establishing violations of multiple water quality-based effluent limitations.

**E. BAT/BCT and Best Management Practices**

270.   BMPs implemented by Saint-Gobain at the Facility—individually or collectively—do not constitute compliance with the General Permit's technology-based BAT/BCT requirements.

271.   Saint-Gobain has failed to implement minimum and advanced Best Management Practices commonly employed by similar industrial facilities.

272.   Saint-Gobain's pattern of exceeding U.S. EPA Benchmarks demonstrates that the Facility is operating with BMPs that are insufficient and/or ineffective to meet the BAT/BCT standard.

273.   Saint-Gobain has not sufficiently evaluated and amended Best Management Practices in response to Exceedance Response Actions status and

Annual Comprehensive Facility Compliance Evaluations, as required by the General Permit.

274.   Best Management Practices implemented by Saint-Gobain at the Facility have not prevented, and will not prevent, the Facility's pollutant sources from contributing pollutants to storm water discharged to waters of the United States that violate the technology-based and water quality-based effluent limitations.

275.   Each day Saint-Gobain operates the Facility without BMPs achieving BAT/BCT-level pollutant reductions is a separate and distinct violation of the General Permit's technology-based effluent limitations and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

276.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**F.  Receiving Water Limitations**

277.   Saint-Gobain has violated and continues to violate the General Permit's Receiving Water Limitations. General Permit § VI.A-C.

278.   Saint-Gobain's storm water sampling data establishes that the Facility is causing and/or contributing to violations of applicable WQSs in violation of the General Permit's Receiving Water Limitation. General Permit § VI.A-C.

279.   Zinc concentrations in samples collected during the last four (4) Reporting Years (2020-2021, 2021-2022, 2022-2023, 2023-2024) average 4.59 times higher than the CTR's 0.09 mg/L "end of pipe" standard. *See* Table 3.

280.   Saint-Gobain has violated and continues to violate the General Permit's water quality-based effluent limitations. General Permit § VII.A.

281.   Saint-Gobain has not, to LA Waterkeeper's knowledge based on publicly available records, taken any corrective action to remedy these ongoing violations of the General Permit's Receiving Water Limitation or water quality-based effluent limitations. See General Permit § XX.B.1.

282.   Saint-Gobain is liable for violations of the Act and General Permit's Receiving Water Limitations for each day of significant rainfall from February 26, 2020 to the present, and for violations of related remedial mandates on an ongoing basis. *See* EXHIBIT 1 (at Appendix 2 to the Notice Letter, *"List of Qualifying Storm Events from January 2020–February 2025"*).

283.   Saint-Gobain is liable for violations of the Act and General Permit's water quality-based effluent limitations for each day of significant rainfall from February 26, 2020 to the present, and for violations of related remedial mandates on an ongoing basis. *See* EXHIBIT 1 (at Appendix 2 to the Notice Letter, *"List of Qualifying Storm Events from January 2020–February 2025"*).

284.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**G. TMDL Requirements**

285.   The interim standard for assessing compliance with the Dominguez/Harbor Waters TMDL is the General Permit's NAL for total suspended solids. General Permit Attachment E at 19-23.

286.   During the 2020-2021 Reporting Year, Saint-Gobain exceeded the NAL and entered Level 1 status for total suspended solids.

287.   During the 2020-2021 Reporting Year, Saint-Gobain exceeded the NAL

and entered Level 2 status for zinc, a toxic pollutant for which the Inner Harbor is impaired.

288.   The Facility has exceeded the NAL and U.S. EPA Benchmarks for zinc and total suspended solids on at least 23 occasions. See *infra* Sec.V.D.

289.   Zinc and total suspended solids exceedances constitute violations of the General Permit's interim requirements implementing the Dominguez/Harbor Waters TMDL for discharges to the Inner Harbor. General Permit § VII.

290.   Based on Waterkeeper's analyses, BMPs implemented at the Facility are insufficient to prevent concentrations of copper, cadmium, lead, zinc, and PAHs in storm water discharges consistent with WLAs to Responsible Dischargers.

291.   Saint-Gobain has been and will remain in ongoing violation of the General Permit's TMDL requirements each day of significant rainfall from February 26, 2020, to the present. *See* EXHIBIT 1 (at Appendix 2 to the Notice Letter, *"List of Qualifying Storm Events from January 2020–February 2025"*).

292.   Civil penalties and injunctive relief are available remedies for these violations. 33 U.S.C. §§ 1311, 1342.

293.   LA Waterkeeper will include additional violations as information becomes available.

**H. Exceedance Response Actions**

294.   A review of the Level 1 ERA Report submitted on December 29, 2021, demonstrate that Saint-Gobain did not assess all Facility zinc pollutant sources potentially contributing to exceedances (e.g., zinc is present in the granules used at the Facility but Saint-Gobain asserts exceedances are from non-industrial sources).

295.   A review of the Level 2 ERA Report submitted in December 2021, as well as storm water monitoring data from 2021, demonstrate that the report does not identify sufficient additional BMPs necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

296.   The December 2021 Level 2 ERA Report lists increased sweeping and installation of catch basin inserts as additional BMPs to prevent zinc exceedances.

297.   Storm water samples from the 2021-2022, 2022-2023, and 2023-2024 Reporting Years establish that zinc concentrations in storm water discharges continued to exceed NALs, and demonstrates that identified/implemented BMPs are insufficient to comply with the General Permit's discharge standards, including without limitation technology-based effluent limitations. See EXHIBIT 1 (at Appendix 1 to the Notice Letter, "*Summary of CertainTeed's Self-Reported Storm Water Sampling Data*").

298.   A discharger that is not in full compliance with the Level 1 status and/or Level 2 status ERA requirements is in violation of the General Permit. General Permit § I.N.77.

299.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**I.   Discharge Prohibitions**

300.   A review of all publicly available information establishes that Saint-Gobain has and continues to violate the General Permit Discharge Prohibitions. *See* e.g., General Permit §§ III.B and D.

301.   Saint-Gobain's release of contaminated water from the Facility and the

discharge of stormwater containing exceedingly high pollutant concentrations violate one or more prohibitions contained in the Basin Plan. *See* e.g., General Permit §§ III.B and D.

302. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

## VI.       CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Technology-Based Effluent
Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

303. LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

304. Saint-Gobain has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of Best Management Practices at the Facility that achieve the technology-based BAT/BCT treatment standards.

305. Saint-Gobain discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

306. Defendant's failures to develop and/or implement Best Management Practices that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility are violations of the General Permit's technology-based effluent limitations and the Act. *See* General Permit §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

307. Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

308. Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

309. Defendant's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

310. Saint-Gobain is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 26, 2020 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

311. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

312. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

## **SECOND CAUSE OF ACTION**

**Defendant's Discharges of Contaminated Storm Water in Violation
of the General Permit's Water Quality-Based Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

313.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

314.   Since at least February 26, 2020, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's water quality-based effluent limitations. *See* General Permit § VI.A.

315.   Since at least February 26, 2020, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that adversely impact human health and the environment in violation of the General Permit's water quality-based effluent limitations. *See* General Permit § VI.B.

316.   Since at least February 26, 2020, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that threaten to cause pollution or a public nuisance in violation of the General Permit's water quality-based effluent limitations. *See* General Permit § VI.C.

317.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Facility, occur each time storm water was/is discharged from the Facility.

318.   Defendant's violations of the General Permit's water quality-based effluent limitations are ongoing and continuous.

319.   Each and every violation of any of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

320.   Every day, since at least February 26, 2020, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. *See* 33 U.S.C. § 1311(a).

321.   Saint-Gobain is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 26, 2020, to the present, pursuant to sections 309(d) and 505 of the Act. *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

322.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

323.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

/ / /

/ / /

/ / /

## THIRD CAUSE OF ACTION

**Defendant's Discharges of Stormwater Violate the**
**General Permit's Total Maximum Daily Load Requirements**
**(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

1.      LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

2.      Defendant exceeded the NAL and entered Level 1 status for total suspended solids in the 2020-2021 Reporting Year.

3.      Defendant exceeded the NAL and entered Level 2 status for zinc in the 2020-2021 Reporting Year.

4.      The Inner Harbor is impaired for zinc.

5.      Defendant's exceedances constitute violations of the General Permit's interim requirements implementing the Dominguez/Harbor Waters TMDL for discharges to the Inner Harbor. General Permit § VII.

6.      Defendant's violations of the General Permit's TMDL requirements are ongoing and continuous.

7.      Each day since February 26, 2020, that Defendant has not met the General Permit's interim TMDL requirements in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

8.      Saint-Gobain is subject to an assessment of civil penalties for each and every violation of the Act occurring from February 26, 2020, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

9.      An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

10.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Defendant's Failure to Prepare, Implement, Review, and Update An Adequate Storm Water Pollution Prevention Plan
### (Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

11.    LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

12.    Defendant has not developed and implemented a legally adequate Pollution Prevention Plan for the Facility, including failing to comply with those requires detailed above.

13.    Defendant's violations of the General Permit's Pollution Prevention Plan requirements are ongoing and continuous.

14.    Each day since February 26, 2020, that Defendant has not developed, implemented, and reviewed and updated a legally adequate Pollution Prevention Plan for the Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

15.    Defendant has been in violation of the General Permit's Pollution Prevention Plan requirements every day since February 26, 2020. Violations continue

each day that an adequate Pollution Prevention Plan for the Facility is not developed and fully implemented.

16.    Saint-Gobain is subject to an assessment of civil penalties for each and every violation of the Act occurring from February 26, 2020, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

17.    An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

18.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Develop and Implement
### An Adequate Monitoring Implementation Plan
### (Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

19.    LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

20.    Defendant has failed to collect storm water samples from all discharge points at the Facility as required by the General Permit.

21.    Defendant has failed to collect storm water samples as required by the General Permit, including without limitation failing to collect sufficient samples

during qualifying storm events during the 2018-2019, 2019-2020, 2020-2021, 2021-2022, 2022-2023, and 2023-2024 storm water years.

22.    Defendant has failed to analyze all storm water samples collected at the Facility for all pollutant required by the General Permit, including without limitation aluminum, cadmium, copper, iron, lead, and nickel.

23.    Defendant has failed to comply with the General Permit's Water Quality Based Corrective Actions. General Permit § XX.B.

24.    Defendant has not developed and implemented a legally adequate monitoring and reporting program, or Monitoring Implementation Plan, for the Facility.

25.    Defendant's violations of the General Permit's Monitoring Implementation Plan mandate are ongoing and continuous.

26.    Each day since February 26, 2020, that Defendant has not developed and implemented a lawful Monitoring Implementation Plan for the Facility and all areas of industrial activity in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

27.    Saint-Gobain is subject to an assessment of civil penalties for each and every violation of the Act occurring from February 26, 2020, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

28.    An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

29.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.     Declare Defendant to have violated, and to be in violation of, the General Permit and Act as alleged herein;

b.     Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

c.     Order Defendant to immediately implement storm water pollution control technologies and measures that achieve BAT/BCT-level pollutant reductions, and that prevent pollutants in the Facility's storm water discharges from contributing to violations of any water quality standards;

d.     Order Defendant to prepare a Pollution Prevention Plan consistent with the General Permit's requirements, and implement procedures to regularly review and update the Pollution Prevention Plan to ensure ongoing compliance with Pollution Prevention Plan requirements;

e.     Order Defendant to prepare a Monitoring Implementation Plan consistent with the General Permit's requirements, and comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to

1  compensate for past monitoring violations;

2      f.    Order Defendant to pay civil penalties of up to $59,973.00 for each

3  violation alleged herein pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§

4  1319(d), 1365(a); 40 C.F.R. §§ 19.1–.4;

5      g.    Order Defendant to take appropriate actions to restore the quality of waters

6  impaired or adversely affected by its activities;

7      h.    Award Plaintiff's costs (including reasonable investigative, attorney,

8  witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

9  § 1365(d); and,

10      i.    Award any such other and further relief deemed appropriate by the Court.

11

12  DATED: May 2, 2025                    Respectfully submitted,

13                              By:    /s/ Jesse C. Swanhuyser

14                                    Jesse C. Swanhuyser

15                                    SYCAMORE LAW, INC.
                                     Attorney for Plaintiff

16

17

18

19

20

21

22

23